IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | | |
|---|---|---|
| MICHAEL B. BROWN, | * | |
| Plaintiff, | * | |
| vs. | * | CASE NO. 4:21-CV-162 (CDL) |
| OFFICER ROBERT HOOKS, *et al.*, | * | |
| Defendants. | * | |

O R D E R

Plaintiff Michael Brown claims that his elderly mother was forcibly removed from her home in October 2020, was sent to a hospital, and later died in April 2021 due to injuries she sustained when she was removed from her home. Brown attempted to assert at least twenty counts against nearly three dozen defendants. The Court previously dismissed all of Brown's claims against most of the Defendants because Brown failed to state a claim against them. *Brown v. Columbus Police Dep't*, No. 4:21-CV-162 (CDL), 2022 WL 1546714, at *1 (M.D. Ga. May 16, 2022).[1] The

---

[1] Brown tried to resurrect the claims against the dismissed Defendants by filing a new action in this Court (4:22-cv-158) and an action in the Superior Court of Muscogee County, which was removed to this Court (4:22-cv-189). Both new actions were consolidated with this action, and the Court considered the new complaints to be the Fifth and Sixth Amended Complaints in this action. Several dismissed Defendants objected to the new amended complaints, and the Court struck the Fifth and Sixth Amended Complaints as impermissible shotgun pleadings. *Brown v. Columbus Consol. Gov't*, No. 4:21-CV-162 (CDL), 2022 WL 17905522, at *4 (M.D. Ga. Dec. 23, 2022). Thus, the claims against the dismissed Defendants remain dismissed.

only remaining claims are against Columbus, Georgia police officers Robert Hooks, Kertavious Coppins, Aaron Guillaume, Rachel Blanks, and Seth Cole, as well as Columbus Police Department Open Records Compliance Coordinator Kimberley Myhand (collectively, "CCG Defendants").[2] These remaining claims are based on Brown's assertion that officers violated the Fourth Amendment rights of his late mother, Clara Virginia Britton, when they conducted a welfare check and removed her from her home.[3] *Id.* at *1 (construing the allegations against the CCG Defendants as claims based on officers' removal of Britton from her home and noting that the allegations "arguably give rise to Fourth Amendment claims under 42 U.S.C. § 1983"). Presently pending before the Court is the CCG Defendants' summary judgment motion. As discussed below, the motion (ECF No. 196) is granted.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

---

[2] The Court previously dismissed Brown's claims against Columbus Consolidated Government, Columbus Police Department, and Columbus Fire Department. *Brown*, 2022 WL 17905522, at *5.

[3] Technically, the only remaining claims are Brown's wrongful death claims, which are based on his contention that the officers' conduct on October 22, 2020 violated the Fourth Amendment and caused Britton's death in April of 2021. The Court previously found that Brown had dismissed any claims belonging to Britton's estate, including a survival action based on Britton's pre-death injuries that were not alleged to have resulted in her death. *Brown*, 2022 WL 1546714, at *2. The Court nonetheless considers both the "search" and "seizure" claims here.

P. 56(a). In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

In accordance with the Court's local rules, the CCG Defendants submitted a statement of undisputed material facts with their summary judgment motion. *See* M.D. Ga. R. 56 (requiring a statement of material facts supported by the record). Brown, who is proceeding pro se, received a notice regarding the significance of the CCG Defendants' summary judgment motion. He filed a response to the summary judgment motion, asserting that some of the CCG Defendants' fact statements are false, but he did not submit *evidence* that creates a genuine fact dispute on any material issue. Most of his responses to the CCG Defendants' summary judgment do not cite any evidence at all. Brown does rely on one police report, which the Court considered. *See* Pl.'s Resp. to Defs.' Mot. Summ. J. ¶¶ 49, 65, ECF No. 219-1 (citing Pl.'s Am. Compl. Ex. 11, Blanks Report (Oct. 22, 2020), ECF No. 77-12). The Court also reviewed the CCG Defendants' citations to the record,

3

including the audio and video recordings that the CCG Defendants submitted. In determining whether there is a genuine fact dispute, the Court must view "the facts in the light depicted by the" recordings and may not adopt a version of the facts that is "utterly discredited" by the recordings. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

## FACTUAL BACKGROUND

Michael Brown was severely injured near his home in Columbus, Georgia and was transported to a nearby hospital for treatment on October 15, 2020.[4] The next day, a nurse from the hospital tried to find Brown's next of kin so they could be notified of Brown's condition and location. The nurse was able to reach one of Brown's relatives in Atlanta and learned that Brown's mother, Clara Virginia Britton, lived with Brown. She also learned that Britton was seventy-eight years old, bed bound, and extremely hard of hearing and that Brown was Britton's caregiver. The relative requested a welfare check for Britton. The nurse, in turn, called 911 to ask for a welfare check. Notice of Manual Filing Ex. 2, Audio Recording "3-10162020 191040- 911, Nurse Jessica from Piedmont" at 0:00-1:05, ECF No. 197 (on file with the Court).

---

[4] The parties spill a lot of ink on what happened to Brown, where it happened, who called 911, who responded to the incident, and when and how Brown got to the hospital. These issues are irrelevant to the remaining claims in this action, which are claims based on an alleged violation of Brown's late mother's Fourth Amendment rights.

4

Columbus Police Officer Seth Cole responded to the call, obtained Brown's keys from a nurse, and went to the house Brown shared with Britton.[5]  Cole announced his presence and used Brown's key to unlock the door.  The house was teeming with trash bags and other items that were in large piles all over the floors.[6]  Notice of Manual Filing Ex. 7, Video Recording "Cole 4 (10.16.20 8.17 PM) CAM236_0D00173_202656" at 20:23:47-20:26:40, ECF No. 197 (on file with the Court).  Cole climbed over the piles of stuff in two rooms until he came to a door that was partially blocked by the hoard, but the top part of the door was broken and Cole opened it to see another room filled more piles of stuff, with Britton sitting near the wall opposite the door.  *Id.*  Cole told Britton that he was with the police and that Britton's son was in the hospital.  Britton did not respond to Cole; she was praying and singing and asking for God's protection.  *Id.*  Cole believed that Britton was mentally unstable, and he did not get close enough to touch her, but he could see that Britton was alive and sitting up.  *Id.*  Cole did not believe that Britton was bedridden or that she needed immediate medical attention.  Cole Decl. ¶ 14, ECF No. 196-11.  Therefore, Cole locked the house and left.  Brown does not argue

---

[5] Brown contends that the nurse took his keys without his permission, but he did not cite any evidence that Cole was aware that the nurse lacked permission to take the keys.

[6] Brown insists that the piles are not "trash."  Whether or not it is "trash," the video depicts an extreme amount of stuff, including lots of filled trash bags, piled several feet deep in a chaotic manner.  The Court will refer to these items as "stuff" or "hoard."

that Cole should have tried to remove Britton from the house at that time.

On October 21, 2020, Brown was transferred from the hospital to a rehabilitation facility. The next day, October 22, 2020, Brown asked his supervisor from work, Cielo Sonie, to check on his mother. Notice of Manual Filing Ex. 17, Video Recording "Blanks 3 CAM080_0E00262_162748" at 16:26:20-16:26:42, ECF No. 197 (on file with the Court). Sonie went to the house and knocked on the door, but Britton did not answer, so Sonie called 911 to ask the police to help her with a welfare check. Notice of Manual Filing Ex. 3, Audio Recording "4-10222020 144933-911, Cece-Welfare Check" at 00:13-00:36, ECF No. 197 (on file with the Court). Columbus Police Officers Rachel Blanks and Robert Hooks responded to the call and met Sonie at Brown's home.

Sonie reported that Brown had told her Britton was elderly, hard of hearing, and bedridden. Notice of Manual Filing Ex. 16, Video Recording "Blanks 2 CAM080_0E00262_161718" at 16:13:04-16:16:30 (on file with the Court). Sonie also reported that Brown had been in the hospital for over a week and that no one else was taking care of Britton. *Id.* Blanks and Hooks expressed concern that Britton was bedridden and no one was taking care of her. *Id.* Hooks knocked on the front and back doors of the house and called Britton's name, but there was no response. The officers heard noises that made them believe someone was inside the house. Blanks

6

Decl. ¶ 9, ECF No. 196-14; Hooks Decl. ¶ 14, ECF No. 196-16. Based on what Sonie had told the officers—that Britton was bedridden, unable to care for herself, and had been alone in the house for at least seven days without her caregiver—Blanks and Hooks believed that Britton was likely in need of immediate medical attention. Blanks Decl. ¶ 10; Hooks Decl. ¶ 15.  Blanks called dispatch to send someone to open the door.  A locksmith arrived and unlocked the door.

Hooks entered the house, followed by Blanks.  "A horrible smell filled the house[.]"  Blanks Decl. ¶ 12.  There were no lights on in the house, and the officers had to use their flashlights to navigate as they climbed over the piles of stuff to get through the first two rooms of the house and find Britton. *Id.; accord* Notice of Manual Filing Ex. 19, Video Recording "Blanks 5 CAM080_0E00262_165140" at 16:43:20-16:44:20, ECF No. 197 (on file with the Court).  As he made his way through the first two rooms, Hooks called out for "Ms. Clara."  Notice of Manual Filing Ex. 13, "Hooks 5 CAM123_0A00164_164758" at 16:43:34-16:45:16, ECF No. 197 (on file with the Court).  When Hooks found Britton in the third room, he said, "Hey, Ms. Clara, what you doing in here?"  Britton responded, "I'm surviving."  *Id.*  After that, Britton "spoke incoherently."  Hooks Decl. ¶ 18.

Britton was near the wall opposite the door, with more piles of stuff covering the floor between her and the officers.  Video

7

Recording "Blanks 5 CAM080_0E00262_165140" at 16:46:13-16:46:50. From the doorway, Blanks "observed what appeared to be bottles of bodily fluids scattered about the bedroom." Blanks Decl. ¶ 14. Blanks repeatedly asked Britton if she had food, and Britton did not directly answer but instead talked about the wiring and the lights; then Blanks asked herself how Britton was going to the bathroom and said, "we need to get her out of here." Video Recording "Blanks 5 CAM080_0E00262_165140" at 16:46:13-16:46:50. According to Blanks, Britton "was not very coherent and her sentences were not making any sense." Blanks Report at 2. Blanks observed "many cockroaches" but no edible food or water. *Id.*

Based on her observations and what she had been told by Sonie, Blank believed that the house did not have power or running water, that Britton was confined to a small area of the house, that Britton "had been in her position for over a week without proper nutrition or the ability or means to relieve and clean herself." Blanks Decl. ¶ 14. Hooks likewise concluded that Britton was trapped in the house and needed medical attention, and he called for emergency medical services and Fire Department personnel ("EMS Team"). Hooks Decl. ¶ 18.

The EMS Team arrived, made their way to Britton, and discovered that Britton had been sitting in her own urine and feces for some time. Blanks Decl. ¶ 17; Blanks Report at 2. According to Blanks, Britton "was not very happy" with the EMS Team, and she

8

"asked them to leave." Blanks Report at 2. The parties did not point to any recordings of the interaction between Britton and the EMS Team, although Blanks reported that Britton "could not answer any of their questions" and the EMS Team determined that Britton "needed to be transported to the hospital." *Id.* The parties also did not point to evidence of what exactly happened while the EMS Team figured out how to get Britton over all the piles of stuff and out of the house, but Brown did point to a medical record documenting that the EMS Team gave Britton ketamine for agitation and that Britton reported to a nurse that she was removed "from her home against her will." Pl.'s Reply in Supp. of Mot. to Am. Compl. Ex. C, Medical Record 3 (Oct. 22, 2020, 8:00 PM), ECF No. 204-4. By the time the EMS Team carried Britton out of the house in a sheet and placed her on a stretcher, Britton was quiet and still. Notice of Manual Filing Ex. 20, Blanks 6 CAM080_0E00262_175908 at 17:58:15-17:58:57, ECF No. 197 (on file with the Court). Neither Hooks nor Blanks had any physical contact with Britton, directly or indirectly. Blanks Decl. ¶ 16; Hooks Decl. ¶ 20. Britton was transported to the hospital in an ambulance. She was later diagnosed with several problems, including sepsis, acute encephalopathy, acute kidney injury, and hallucinations.

Kertavious Coppins, Aaron Guillaume, and Kimberley Myhand were not involved in the removal of Britton from her home; they

9

have never visited the home that Brown and Britton shared and have never interacted with Britton. Coppins Decl. ¶¶ 4-7, ECF No. 196-9; Guillaume Decl. ¶¶ 4-7, ECF No. 196-7; Myhand Decl. ¶¶ 4-5, ECF No. 196-4. Brown did not point to any evidence to dispute the sworn declarations of these three Defendants.

DISCUSSION

Brown's only remaining claims in this action are his 42 U.S.C. § 1983 claims against the CCG Defendants based on the Columbus officers' welfare checks on Britton and the removal of Britton from her home. The Fourth Amendment's protection against unreasonable searches and seizures provides the constitutional source of the rights at issue here. *See Michigan v. Fisher*, 558 U.S. 45, 46 (2009) (per curiam) (applying Fourth Amendment to warrantless entry of home); *Graham v. Connor*, 490 U.S. 386, 395 (1989) (concluding that seizures of free citizens "should be analyzed under the Fourth Amendment").[7] Under the Fourth Amendment, searches and seizures inside a home without a warrant are usually unreasonable, but that presumption of unreasonableness "can be overcome" if "exigencies of the situation . . . make the needs of law enforcement so compelling that the warrantless search is objectively reasonable." *Fisher*, 558 U.S. at 47 (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)).

---

[7] Brown also invokes the Fifth and Fourteenth Amendments, but the remaining claims in this action are clearly Fourth Amendment claims.

10

As a preliminary matter, the CCG Defendants presented evidence that Coppins, Guillaume, and Myhand were not involved in the welfare checks or the removal of Britton from her home. Brown did not point to any evidence to create a genuine fact dispute on this issue. Without any evidence that Coppins, Guillaume, or Myhand was involved in the search and seizure of Britton, these three Defendants are entitled to summary judgment.

It is undisputed that Cole, Blanks, and Hooks did enter Britton's home without a warrant and that Blanks and Hooks directed the EMS Team to evaluate Britton to determine whether she needed medical attention. The CCG Defendants argue that Cole, Blanks, and Hooks are entitled to qualified immunity on the Fourth Amendment claims against them. Qualified immunity protects government officials acting in their discretionary authority from suit unless their conduct "violates clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Gaines v. Wardynski*, 871 F.3d 1203, 1206 (11th Cir. 2017) (quoting *Sanders v. Howze*, 177 F.3d 1245, 1249 (11th Cir. 1999)). Brown does not dispute that the CCG Defendants were acting in their discretionary authority when they took the actions that gave rise to this action. To survive summary judgment, Brown must establish that the evidence, viewed in the light most favorable to him, demonstrates that a Defendant violated Britton's constitutional rights and that those rights were clearly

11

established at the time of the violation. *Id.* at 1208. For a right to be clearly established, existing precedent must have placed the constitutional question "beyond debate." *Id.* at 1210 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

The CCG Defendants contend that the "emergency aid" exception to the warrant requirement applies here. Under that exception, "law enforcement officers 'may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" *Fisher*, 558 U.S. at 47, (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). "For this exception to apply, the officer must have both exigent circumstances and probable cause." *Roberts v. Spielman*, 643 F.3d 899, 905 (11th Cir. 2011) (per curiam). These requirements are satisfied if the officer has an objectively reasonable basis to believe that a person inside the house "is in need of immediate aid." *Fisher*, 558 U.S. at 47 (quoting *Mincey*, 437 U.S. at 392). An officer does not need "ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Id.* at 49. Rather, the officer must have "an objectively reasonable basis for believing" a person inside the house is in danger or needs medical assistance. *Id.* (quoting *Brigham City*, 547 U.S. at 406).

In *Roberts*, for example, a deputy responded to a 911 call for the plaintiff's possible suicide attempt. 643 F.3d at 906. The

deputy spoke with the 911 caller, a relative of the plaintiff, and learned that the plaintiff, who had bipolar disorder and a history of suicide attempts, was not responding to her family's attempts to reach her. Based on that information, the deputy went into the plaintiff's home, grabbed her arm, and escorted her outside to try and calm her down and assess her mental state. *Id.* at 902-03. The Eleventh Circuit concluded that the deputy did not violate the Fourth Amendment because he reasonably believed that the plaintiff was threatening suicide at the time. *Id.* at 906. When it was clear to the deputy that there was no longer an exigency requiring his attention, the deputy left the property. *Id.*

Similarly, in *United States v. Evans*, officers responded to 911 calls reporting gunshots. 958 F.3d 1102, 1104 (11th Cir. 2020). The suspected gunman initially refused to leave the house, and the officers thought there might be someone inside the house with him. After the suspect left the house, the officers heard whimpering coming from inside, and they went inside to determine if there was a person in distress. *Id.* at 1105. They found that dogs were the source of the whimpering sounds. The Eleventh Circuit concluded that the emergency aid exception applied because the officers reasonably believed that there might be a gunshot victim inside the house. *Id.* at 1106; *accord Fisher*, 558 U.S. at 48 (concluding that it was "plain" that an officer's warrantless entry into a home "was reasonable under the Fourth Amendment" where

13

he responded to a disturbance call, found a crashed pickup truck with blood on it outside the house, saw through the window a man inside the house screaming and throwing things, and observed that the man had a bleeding cut on his hand).

Here, Cole, Blanks, and Hooks responded to two separate calls for welfare checks on Britton—one from a family member in Atlanta and another that originated because Brown himself asked Sonie to check on Britton.  Based on the information they received, the three officers understood that Britton was in the house, that she was elderly and bedridden, and that her caregiver was not able to care for her because he was in the hospital.  The officers went to the house and knocked on the door.  No one answered, though the officers heard noises suggesting that someone was inside the house.  Under these circumstances, the three officers reasonably believed that Britton was inside the house and that she was in danger.  They had at least arguable probable cause to enter the house and see if Britton needed immediate medical attention.  Accordingly, Cole, Hooks, and Blanks are entitled to qualified immunity on the Fourth Amendment claims arising from their entry into Britton's house.

Turning to the claims based on the seizure of Britton, the present record establishes that Blanks and Hooks directed the EMS Team to determine whether Britton needed medical attention.  The EMS Team—not Blanks or Hooks—removed Britton from her home.  Therefore, it is not clear that Blanks and Hooks "seized" Britton.

14

But even if Blanks and Hooks directed the seizure, the Court is aware of no authority clearly establishing that the seizure was unlawful under the circumstances.  The Eleventh Circuit has recognized that "[m]ental-health seizures are reasonable under the Fourth Amendment when the officer has probable cause to believe that the seized person is a danger to himself or to others." *Ingram v. Kubik*, 30 F.4th 1241, 1250 (11th Cir. 2022).  In *Ingram*, for example, the Eleventh Circuit concluded that an officer had probable cause to believe that the plaintiff was in danger because he was in an active mental health crisis and had just slit his wrist with a knife.  *Id.*  Thus, the officer "had probable cause to seize" the plaintiff.  *Id.* at 1251; *accord Ellison v. Hobbs*, 786 F. App'x 861, 876-77 (11th Cir. 2019) (per curiam) (concluding that officers did not violate the plaintiff's Fourth Amendment rights in removing her from her home and transporting her to the hospital because the plaintiff's neighbor reported that the plaintiff was having a manic breakdown and becoming combative—which the officers observed—and the paramedics determined that she needed to go to the hospital).

Here, Blanks and Hooks responded to a 911 call for a welfare check of a bedridden, elderly lady who had been without her caregiver for more than a week.  They had no reason to doubt the information Sonie gave them about Britton's condition or her statement that she received the information directly from Brown.

15

Brown argues that Britton was surviving satisfactorily without intervention, but the present record, including the video footage, provides absolutely no support for that assertion.  Rather, the record establishes that Blanks and Hooks found Britton confined to a small area of her home, surrounded by a hoard that made it impossible to move in the house without climbing over huge piles of stuff.  The officers were overwhelmed by a foul odor, there was no edible food or water in sight, cockroaches were everywhere, and the EMS Team found that Britton had been sitting in her own urine and feces for some time.  The EMS Team also determined that it was medically necessary for Britton to be transported to the hospital.

Brown contends that Britton competently refused medical services and should not have been removed from the house.  But he did not point to any *evidence* to refute the CCG Defendants' evidence that Britton appeared incoherent and unable to answer the EMS Team's questions.  Based on the present record, an officer faced with the same facts could reasonably concur with the EMS Team that Britton was in urgent need of medical treatment and incapable of making medical decisions for herself.  So, even if Blanks and Hooks were responsible for directing the EMS Team's seizure of Britton, they had at least arguable probable cause to do so.  There is simply no authority clearly establishing that an officer who finds a bedridden, elderly, incoherent citizen sitting in her own waste, without any visible source of food or water,

16

violates the Fourth Amendment when the officer directs that the citizen be transported from her home for medical treatment. For these reasons, Blanks and Hooks are entitled to qualified immunity on the Fourth Amendment claims arising from Britton's seizure.

In addition to the unlawful search and seizure claims, Brown asserts that unnamed police officers injected Britton with ketamine and that the October 22, 2020, ketamine injection contributed to Britton's death approximately six months later. The Court construes this allegation as a claim that Blanks and Hooks used excessive force on Britton during the seizure. The CCG Defendants presented evidence that Blanks and Hooks never had any physical contact with Britton, and Brown did not point to any evidence to create a genuine fact dispute on this issue. Brown also did not point to any evidence that Hooks or Blanks knew that the EMS Team injected Britton with ketamine or had any involvement in the decision. Thus, the record would not permit a reasonable factfinder to conclude that Blanks or Hooks used any force on Britton, and they are entitled to summary judgment on this claim.[8]

Finally, the CCG Defendants note that in at least two of the documents comprising his "complaint," Brown invoked Georgia's Open

---

[8] To the extent that Brown's "complaint" asserted state law claims based on the search and seizure of Britton, the officers are entitled to official immunity for the same reasons they are entitled to qualified immunity. *See* Ga. Const. Art. 1, § 2, ¶ IX(d) (providing Georgia law enforcement with official immunity on tort claims against them for their discretionary acts unless they acted "with actual malice or with actual intent to cause injury").

Records Act, O.C.G.A. § 50-18-70 *et seq.* Compl. at Count 7, ECF No. 1 (vaguely alleging that an unnamed person or agency violated Georgia's Open Records Act); Suppl. to 4th Am. Compl. at Count 7, ECF No. 78 (stating that Count 7 is "in regard to Kimberley Myhand and the Compliance Department within the Columbus Policle [sic] Department"). The Court did not recognize an Open Records Act claim because Brown made zero factual allegations to support such a claim, but the CCG Defendants addressed the "claim" in their summary judgment motion out of an abundance of caution. Under O.C.G.A. § 50-18-73, Georgia superior courts may entertain actions to enforce the state's Open Records Act. Even if this Court has jurisdiction to entertain such a claim, the CCG Defendants provided evidence that Myhand responded to all the open records requests she received from Brown and that she produced all the responsive records that existed and were in the custody of the Columbus Police Department. Myhand Decl. ¶¶ 7-13, ECF No. 196-4. Brown did not point to any evidence to create a genuine fact dispute on this issue; he presented no evidence that he made a specific open records request to which Myhand or someone else at the Columbus Police Department did not respond. Accordingly, even if there were an Open Records Act claim still in the case, the CCG Defendants would be entitled to summary judgment on it.

CONCLUSION

For the reasons set forth above, the Court grants the CCG Defendants' summary judgment motion (ECF No. 196). Neil Desai's motion to dismiss (ECF No. 211) is terminated as moot because the Court previously struck the complaints that are the subject of the motion. *See Brown v. Columbus Consol. Gov't*, No. 4:21-CV-162 (CDL), 2022 WL 17905522, at *5 (M.D. Ga. Dec. 23, 2022). The Court denies Brown's "motion for new trial," which is really an untimely motion for reconsideration of the Court's December 23, 2022 order, because Brown asserts no valid basis for reconsideration (ECF No. 221). The Court also denies Brown's motion for sanctions (ECF No. 222) and his motion for a ruling on the motion for sanctions (ECF No. 226) because both appear to be motions to compel discovery responses. Both motions were filed well after discovery closed in November of 2022, and Brown did not establish good cause to amend the scheduling order or reopen discovery.

IT IS SO ORDERED, this 10th day of May, 2023.

S/Clay D. Land
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA